IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| RONALD G. BUFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:14-CV-00012 |
| | ) | |
| AMMAR'S INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Defendant Ammar's Inc. ("Ammar's") has filed herein a motion for summary judgment and supporting memorandum [ECF 67].  Material questions of fact preclude summary judgment.  The motion is therefore without merit and must be denied.

INTRODUCTION

Ronald Buford is a 69 year old, African American, long-time employee of Ammar's.  Born in 1945, Buford is the oldest person working in Ammar's warehouse, is one of only three African-American warehouse employees, and has worked for Ammar's much longer than most of Ammar's warehouse employees.  After 24 years of service, Buford makes $10.70 an hour — only $1.70 more than new hires — and approximately $3.00 less than a younger, white employee in his department hired a year after him.  On February 13, 2013, in a transparent effort to try to get Buford to quit, Ammar's demoted Buford, took away Buford's full-time job and cut his hours to 20 hours per week, and stripped him of all benefits.  Ammar's claims it did this because after 24 years of service, Buford was chosen as one of 3 employees in its warehouse affected by an unwritten, undocumented reduction in force.

<u>FACTS</u>

Ammar's owns 19 retail stores known as "Magic Marts" in West Virginia, Kentucky, Virginia, and North Carolina and employs over 800 people (Exhibit 1, at 16, 17; Exhibit 2, at 11).  The company has enjoyed extraordinary success.  Ammar's had annual sales of over 90 million dollars in 2012 (Exhibit 3).  Ronald Buford went to work for Ammar's in its warehouse in Bluefield, West Virginia on July 17, 1990 (Exhibit 4).  Over 24 years later, at age 69 he is the oldest warehouse employee (<u>Id.</u>).  He is also one of only three African-American warehouse workers,

> Q.  Are there any black persons working in the office?
> A.  No.
> Q.  What about among the other sector, you described, the buyers and the --
> A.  No --
> Q.  -- group of 33?
> A.  -- not that I'm aware of.
> Q.  What about since you have been here?  Have there been any blacks working in either sector?
> A.  No.
> Q.  How about in the warehouse?  How many blacks work in the warehouse?
> A.  Three currently.
> Q.  Mr. Buford is one of them?
> A.  Uh-huh(yes).
> Q.  What are the names of the other two?
> A.  Ronald Joplin and Jackson Martin.
> Q.  How long has Mr. Joplin worked at the company?
> A.  Approximately two-and-a-half years, I would think.
> Q.  Mr. Martin?
> A.  Probably about three or three-and-a-half years, without checking the records.

(Ex. 2, at 12-13; *see also* Exhibit 5, at 14).

Ammar's never wanted to hire Buford in the first place.  After a local lumber company went out of business in 1989, Buford and several coworkers sought employment with Ammar's (Exhibit 6).  Ammar's hired Buford's white coworkers but

refused to offer employment to Buford (Id.).  Buford recalled that after he graduated from Bluefield State College and spent a few years living in New York, he returned home to work as a teacher for the Mercer County public schools for 4 years (Id.).  He then worked for Bailey Lumber Company for 11 years until it went out of business in 1989 (Id.).  The West Virginia Employment Commission sent Buford and several coworkers from Bailey's down to Ammar's to apply for employment (Id.).  Ammar's hired all of the white workers from Bailey's (Robert Brownfield — left shortly before Bailey's shut down, Gary Nichols, and Hunter Thomas) but would not hire Buford (Id.).  Jerry Carter (now a vice-president at Ammar's) told Buford that Ammar's was not doing any more hiring (Id.).  Buford called to speak with Ammar's periodically thereafter to inquire about employment (Id.).  Each time Buford was told that Ammar's was not doing any more hiring.  Buford knew this was not true because people were leaving Ammar's during this time period, and the company continued to hire (Id.).  Then one day Buford ran into Robert Brownfield (Id.).  Brownfield told Buford that he had put in a good word for Buford and told Mr. Carter that Buford was an excellent worker (Id.).  Buford was finally hired thereafter in July, 1990 (Id.).

Though he had a college degree, Ammar's assigned Buford to work in the warehouse.  Beginning in 1990, Buford worked as the receiving clerk for UPS, FedEx, and small packaging at Ammar's (Id.).  In this position, he was responsible for unloading trucks, counting the merchandise received, sorting the merchandise to be distributed to the different stores, working purchasing orders for each store, including placing labels on the merchandise that was to be sent to the stores, and processing invoices, which were then sent to the office (Id.).  For 18 years, Buford worked in this

position without incident.   For 18 years, Buford worked for Ammar's without ever

receiving a write-up (Ex. 2, at 31).   For 18 years, Buford received a raise every year.

Then, at age 63, the raises suddenly stopped,

> Q    And did you tell us earlier that you haven't had a raise since you
> turned 63 back in 2008?
> A    That's correct.
> Q    Up until you turned 63, did you get raises from time to time over the
> years?
> A    Yes, I did, every year.
> Q    Did anyone foster a complaint about your work before you turned 63?
> A    Never.
> Q    Were you ever written up before you turned 63?
> A    Never.

(Ex. 5, at 160-61).  And, on April 16, 2009, at age 64, Buford was written up for working

too slowly while delivering mail to the office — a job that was ancillary to his main

duties in the receiving department (Id. at 27, 32).  Approximately a year later, at age 65,

Buford was written up a second time for working too slowly doing the same thing —

delivering mail to the office (Id.).  Finally, approximately 3 years later, in February 2013,

Ammar's took away Buford's full-time job, slashed his hours to 20 hours per week, and

stripped him of all benefits, including health insurance, life insurance, short and long-

term disability coverage, 401-K, and vacation,

> Q.   Were Mr. Buford's hours reduced from full time to part time in 2013?
> A.   Yes, they were.
> Q.   Were his hours cut from full time to 20 hours per week?
> A.   Yes.
> Q.   Did he lose all his benefits?
> A.   He did.
> Q.   Those benefits included what?
> A.    401-K, profit sharing, life insurance, short-term disability, long-term
> disability, vacation time.  I believe that's all of it.

(Ex. 2, at 17; *see also* Ex. 5, at 159).  Buford was then replaced by a younger, white male

employee (Ex. 5, at 29-30, 133).  Lesser men would have quit, but Buford continued to

work.

And though it now claims that it cut Buford's hours for working too slowly, Ammar's stated plainly in a letter dated March 21, 2013 that "*Mr. Buford was at no fault in the reduction of hours*" (Exhibit 7) [Emphasis added].   And, Buford was never told that the demotion had anything to do with his performance,

> Q   Did anybody explain to you from the company what the company is claiming the factors the company relied on to reduce your hours to part-time hours?
> A   The company only told me that there was not enough work for one man to do, even though there were two men working in UPS.  That was the only reason I was given.
> Q   Did anybody explain to you that it was because of your performance record that you were selected for part time?
> A   At that time they said nothing about my performance.
> Q   But they had given you warnings in the past, correct, about your performance?
> A   That was for delivering mail to the office.  That's what those performance, both of them were from K. A. Ammar.  That was not, that was not anything to do with my work in the warehouse where I do all, where I do 90 percent of my job.  That was for delivering mail in the office.
> Q   Okay.
> A   I was moving too slow delivering my mail.
> Q   We will get into those warnings in a minute.  I am just asking you, my question now is when the company demoted you, to use your word, to part time, did anybody in the company explain to you that, one of the factors that the company relied on was your poor performance as a factor for the decision?
> A   No.
> Q   Did anybody tell you that one of the factors was that you had two write-ups and your wages had been frozen for several years as factors in the decision?
> A   All of this came into play after this suit.  I had, I heard nothing about wages being frozen.  As a matter of fact, Jerry Carter went to ask about why I hadn't gotten a raise and -- he didn't know anything about it.

(Ex. 5, at 32-33).

> Q   To this date, the company has never told you that you were demoted because of your performance?
> A   No, not in being demoted to part time, no.

Q   Let me ask the question again:  To this date, is it your testimony that the company has never told you that you were demoted to part time primarily because of your, the company didn't have enough work, and because of your performance and your, you had frozen wages?

A   The only thing stated was --

Q   You shook your head.  Just answer that question part, first of all. When you shake your head, you said no with your head, but you have to state it orally.

A   Okay.  I will say this:  *They did not tell me that being put on part time was due to my performance.*

Q   Okay.

A   Never was that stated.

Q   To this day?

A   To this day.

Q   So this is me asking you the question, that is news to you that the company ever considered your performance in the decision to demote you to part time in February?

A   Yes, it is.  It is news to me.  And I state that emphatically because it wasn't stated to me at the time that I was made part time.

(Ex. 5, at 82) [Emphasis added].

Ammar's also told Buford plainly that the demotion had nothing to do with economics.  Buford recalled that the warehouse workers were told in a meeting by Jerry Carter that there would be no need to reduce the number of warehouse workers or their hours (Id.).  Carter also made a point of saying that Ammar's had more than sufficient funds to take care of business, and as an example talked about Ammar's having plenty of money to remove (excavate) a mountain that was close to the warehouse (Id.).  John King also said in a meeting that "as long as your attendance was good, you (the warehouse workers) would not have anything to worry about" (Id.).  Buford had no concerns because his attendance was excellent (Id.).  In fact, in another meeting Bill Sankbeil commended Buford for superior attendance (Id.).

And, Buford recalled that personnel manager Bill Sankbeil told Buford that he had asked Mr. Ammar not to reduce Buford's hours, but Mr. Ammar would not listen

(Id.).[1]

There was of course never a legitimate issue with Buford's performance, and on August 29, 2014 — in a transparent effort to test Buford to see whether he really wanted to return to full-time work — Ammar's offered to restore Buford's hours to full-time (40 hours per week) (Exhibit 8).  Ammar's plan backfired, however; Buford accepted the offer.  Even then, Ammar's never restored his benefits,

> Q   You are not getting full-time benefits?
> A   No.  I am just working for them full time.  I am not getting full-time benefits.
> Q   Okay.  Right now you are getting full-time wages like you did before.  Correct?
> A   Right.
> Q   But you are not getting the benefits?
> A   No.

(Ex. 5, at 24-25).  Even though Ammar's claims that Buford made a miraculous turnaround in his performance, Ammar's has since cut Buford's hours back to 20 hours per week during the busy Christmas season (Ex. 6).  And, even though Buford has worked for the company for 24 years, Ammar's continues to hire other employees rather than moving Buford back to full-time, "If somebody leaves, we hire one" (Ex. 1, at 39).  Tellingly, Ammar's moved a 34 year old white male who has only worked for Ammar's for 3 years in the same department as Buford back to full-time while leaving Buford, the 69 year old, African-American, 24 year service employee, at 20 hours per week with no benefits (Ex. 4; Exhibit 9).

Further detailing of facts is reserved for argument.

---

[1] Sankbeil testified that Mr. Ammar is the owner of the company (Ex. 2, at 16).

## STANDARD OF REVIEW

Under Rule 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). The party moving for summary judgment is initially responsible for identifying those portions of the factual record which it believes establish that there are no genuine issues of material fact. Once the moving party has made this showing, the opposing party must demonstrate, by reference to affidavits, depositions, answers to interrogatories, or admissions, that a triable issue of fact exits. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The court must determine whether the movant has demonstrated "'that there is an absence of evidence to support [claimant's] case.'" EEOC v. Clay Printing Co., 955 F.2d 936, 940 (4th Cir. 1992) (citing Celotex, 477 U.S. at 325, 106 S.Ct. at 2554). In evaluating a summary judgment motion, the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). Special caution must be exercised when the disposition of an issue turns on a determination of intent. Morrison v. Nissan Co. Ltd., 601 F.2d 139, 141 (4th Cir. 1979). Thus, while summary judgment is available in cases alleging employment discrimination, it should be applied with caution "because the crux of a Title VII dispute is the 'elusive factual question of intentional discrimination.'" Lowe v. City of Monrovia, 775 F.2d 998, 1009 (9th Cir. 1986) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 n.8, 101 S.Ct. 1089, 67

L.Ed.2d 207 (1981)).

Summary judgment should be used only when there is no dispute of fact and there exists only one conclusion; all evidence must point one way and be susceptible of no reasonable inferences sustaining the position of the non-moving party. <u>Johnson v. Minnesota Historical Society</u>, 931 F.2d 1239 (8th Cir. 1991). Any indication of discriminatory motive may suffice to raise a question that can only be resolved by the trier of fact. The movant is not entitled to a credibility finding at the summary judgment level. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Reeves v. Sanders Plumbing Products, Inc.</u>, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing <u>Liberty Lobby</u>, 477 U.S. at 255). Buford, as the non-moving party, is entitled to all inferences on credibility. <u>Stalter v. Wal-Mart Stores, Inc.</u>, 195 F.3d 285 (7th Cir. 1999); Lust v. Sealy, Inc., 383 F.3d 580, 582-83 (7th Cir. 2004) ("There is no presumption that witnesses are truthful."). As the United States Supreme Court has explained, "[i]t is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" <u>Poller v. Columbia Broad. Sys., Inc.</u>, 368 U.S. 464, 473 (1962). And, as recently reiterated by the Supreme Court, it is error for the district court to fail "to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in h[er] favor.'" <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1863, 188 L. Ed. 2d 895, 897 (2014) (quoting <u>Liberty Lobby</u>, 477 U.S. at 255); *see also* <u>Walker v. Mod-U-Kraf Homes</u>, 2014 U.S. App.

LEXIS 24288, at *11 (4th Cir. Va. Dec. 23, 2014) ("[A]t the summary judgment stage, we must view the record in the light most favorable to … the non-moving party" (citing Liberty Lobby, 477 U.S. at 255)).

<u>ARGUMENT AND AUTHORITIES</u>

1. **Plaintiff Has Established a Prima Facie Case of Race Discrimination, and Defendant's Proffered Reason for Cutting Plaintiff's Hours in Half and Stripping Him of His Benefits is Pretext.**

"Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.'" <u>Love-Lane v. Martin</u>, 355 F.3d 766, 786 (4th Cir. 2004) (quoting 42 U.S.C. § 2000e-2 (a)(1)).   Under the <u>McDonnell Douglas</u>[2] proof scheme the plaintiff must first establish a *prima facie* case of discrimination.   <u>Fuller v. Phipps</u>, 1994 U.S. Dist. LEXIS 19548, at *7 (W.D. Va. Dec. 9, 1994).   To establish a prima facie case of race discrimination, Buford must demonstrate that there is a question of fact with respect to whether (1) he is a member of a protected class, (2) he was qualified for his job, (3) despite his qualifications his hours were cut and he was stripped of his benefits, and (4) he was replaced by an individual outside the protected class.   *See* <u>Love-Lane</u>, 355 F.3d at 787.

a. <u>**As an African-American, Buford is a Member of a Protected Class.**</u>

Buford, as "an African-American, is obviously a member of a protected class." <u>Tucker v. Parents Place of Md.</u>, 2008 U.S. Dist. LEXIS 23592, at *23 (D. Md. Mar. 20,

---

[2] <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1972).

2008); *see also* Callwood v. Dave & Buster's, Inc., 98 F. Supp. 2d 694, 709 (D. Md. 2000).

b.  **Buford, an Employee of 24 Years With a Bachelor's Degree, Was Qualified for His Job.**

Buford received a bachelor's of science degree in music education and a minor in art from Bluefield State College in 1972 (Ex. 5, at 123).  Thereafter, subsequent to spending a few years in New York, he became a substitute teacher for the Mercer County school system for 4 years (Ex. 6).  He then worked for Bailey Lumber Company for 11 years until it went out of business (Id.).  Thereafter, he sought employment at Ammar's, Incorporated (Id.).  In 1990, Buford went to work for Ammar's in their receiving department as a receiving clerk for UPS, FedEx, and small packaging (Ex. 4).  For 24 years Buford has worked in the receiving department at Ammar's, where his main responsibilities have been to unload trucks, count the merchandise received, sort the merchandise to be distributed to the different stores, work purchasing orders for each store, including placing labels on the merchandise to be sent to the stores, and process invoices, which are then sent to the office (Ex. 6).  For almost two decades, Ammar's had *zero* complaints concerning Buford's work performance.  Buford never even received a write-up (Ex. 2, at 31).  Buford has always worked as hard as he can for Ammar's (*see* Ex. 8).  To be sure, Buford has aged.  As Mr. Ammar's noticed at deposition, "He's lost a little hair, hasn't he?" (Ex. 1, at 28).  But, he still has the ability to do his job,

> Q   Do you believe you have the mental ability to do your job now currently?
> A  The mental ability?
> Q  Yes, to do your job now.
> A  Yes, I do.
> Q  Do you think you have the physical ability to do your job now?
> A  Yes, I do.

> Q   Do you have the emotional ability to do your job now?
> A   Yes, sir.

(Ex. 5, at 150-51).[3]

It was not until Buford reached age 64 that Ammar's first complained of his performance.  Buford was written up for the first time in his career at Ammar's on April 16, 2009 (Exhibit 10).  Ammar's explained to Buford that he was being written up for delivering mail to the office too slowly — which as stated previously was ancillary to his main duties in the warehouse.[4]  As Buford stated, "Some of the things that are stated in here are so ridiculous --" (Ex. 5, at 74; *see also* id. at 72, 76).  Tellingly, Jimmy Belcher, Buford's direct supervisor (Exhibit 11, at 8), told Buford not to tell anyone that he received this write-up,

> Q   With respect to the first write-up you got after you turned 63, did one
> of your superiors take you aside and talk with you about that write-up?
> A   Yes, sir, he did.
> Q   Who was that?
> A   That was Jimmy Belcher.
> Q   When did he tell you?
> A   He told me not to say anything about this to anyone.  He asked me if I
> would not say anything to anyone about this.

(Ex. 5, at 163; *see also* id. at 78).  Buford's superiors told him that it was the co-chairman of the board of directors, K.A. Ammar, Jr. (Ex. 1, at 20), who had said that he was

---

[3] As Mr. Ammar, noted it is just part of age to slow down to some extent,

> Q.   Do you find that you have slowed down any with age, or no?
> A.   You got to be kidding.  Absolutely.  I can't work in the warehouse.  I
> used to unload trucks and load trucks, drive a truck.  I can't do that
> anymore.  I don't have a CDL, or whatever the license is.

(Ex. 1, at 25).

[4] The jury may find that Ammar's did not want any black person working in or around the office, period, for in Buford's 24 years of service, no black person has ever worked in the office (Ex. 2, at 12-13).

working too slowly in the office.  At deposition, Ammar denied this (Id. at 76-77).  Over

a year later, on August 20, 2010, Buford was written up for the second time in his

career for delivering mail too slowly to the office (Exhibit 12).  Again, the write-up was

ridiculous (Ex. 5, at 80-81).  Buford's direct supervisor, John Lewis (Ex. 11, at 8), did not

even know that Buford was going to be written up,

> Q.    Do you remember telling Mr. Buford that this was "bull shit"?
>
> …
>
> A.   I guess I could have said anything.  I guess anybody could have.  I
> know I was a little flustered on this particular write-up, that I had no
> preemptive warning it was even coming.  I was paged and told to bring
> him up front.

(Exhibit 13, at 9-10).  Lewis had actually been trying to get Buford a raise at the time,

> Q.    Have you ever asked anybody why Mr. Buford hasn't received a
> raise?
> A.   At one time, I did even -- I went and checked to try to get Mr. Buford
> a raise.
>
> …
>
> Q.   Who did you talk to?
> A.   I believe Jerry Carter, sir.
> Q.   What response did you get?
> A.   Raises were on hold at that time.

(Id. at 12).  Yet, as Mr. Ammar, testified,

> Q.    Through the most difficult economic times this company has faced,
> have the wages of the warehouse workers ever been frozen?
> A.   No, not that I know of.

(Ex. 1, 71-72).  And Buford was never told that his wages had been "frozen" — as

Ammar's now claims,

> Q   Were you informed by the company from 2008, from 2009 to present,
> that your wages were frozen?  You didn't receive any increases because
> the company felt you were not performing at your capacity?
> A   No.

> Q   Nobody ever told you that?
> A   No.
> Q   Did anybody ever tell you that they, that Ammar's was not giving you a wage increase because of your, what they believed was performance issues?
> A   No.
> Q   They never informed you of that?
> A   No.

(Ex. 5, at 68).  In fact, no one ever got back with Buford about why he had not received a

raise,

> Q   In that paragraph it says that "Both warehouse manager and assistant manager asked plaintiff, asked why plaintiff had not received a raise." Who was the warehouse manager that you are referring to there in paragraph 16?
> A   I was referring to Jimmy Belcher.
> Q   Okay.  When it says "assistant manager," who are you referring to there?
> A   I was referring to John Lewis.
> Q   Do you remember anything else that they said to you other than they asked you, they asked why plaintiff has not received a raise?
> A   They said that they would find out, but I never got any answer back from them other than that.  It was never spoken that my wages had been frozen.  Never was that word uttered.

(Id. at 70).  As Buford explained, Ammar's never claimed his wages were frozen until he

filed suit,

> A   All of this came into play after this suit.  I had, I heard nothing about wages being frozen.  As a matter of fact, Jerry Carter went to ask about why I hadn't gotten a raise and -- he didn't know anything about it.

(Id. at 32-33).  Likewise, since Buford has filed suit,[5] Ammar's has written him up again

— this time for working too slowly on a project that no one would volunteer to do

because it was so large and time consuming (Exhibit 14).  As Buford explained,

---

[5] Ammar's relies on its activities after Buford was demoted and after Buford filed suit to try to demonstrate that Buford was not adequately performing.  However, as is evident, it matters only what it knew of at the time it decided to cut his hours in half and strip him of his benefits.

14

> I volunteered to help with a job that no one else had started to work on, and did not want to work on, because of the number of items that needed stickers.  I was written up for not completing this job in a timely manner.  At this time I was working part-time, volunteered to help with a time consuming job that no one else had been willing to take on, and which none of the full-time workers helped with.

(Ex. 6).

Continuing in this pattern, on August 18, 2014 Ammar's gave Buford a Performance Improvement Plan ("PIP") (Exhibit 15).[6]  Remarkably, just four working days later, Ammar's claimed that Buford made a miraculous improvement — to the point that it offered him full time work again (Ex. 8),

> Q.  That only leaves four more working days that week.  That would be August 19, 20, 21 and 22.  That gets us to Monday the 25th.  What had he done, in those four days, that led the company to offer him a full-time job back?
> A.  His numbers improved by the order copies he did.
> Q.  That much?
> A.  I would imagine.  Yes.
> Q.  But that almost seems like *a miracle*?
> A.  Uh-huh(yes).

(Exhibit 16, at 13-14) [Emphasis added].  As Belcher testified,

> …How is Mr. Buford doing now?
> A.  Much improved, according to the numbers.
> Q.  Is there anything else to go by?
> A.  No, sir.  I can't say there is.

(Id. at 19).  Yet, Ammar's has since moved Buford back to part-time on November 10, 2014 during the busy Christmas season (Exhibit 17, at 15).  Like most retail businesses, Christmas is a busy time of the year at Ammar's (Ex. 6).  Buford recalled that each year Ammar's tells its employees that the Christmas season is a "make-or-break" time of year (Id.).  And even after the merchandise is shipped from the warehouse to the stores for

---

[6] Sankbeil has clearly stated that Buford has never done anything to warrant termination (Ex. 2. at 25).

Christmas, the warehouse workers are busy getting merchandise ready to ship to the stores after inventory (Id.).  Further, at the same time Ammar's again reduced Buford's hour to 20 hours per week, it continued to offer full-time employment to young, white males.  For instance, Kevin Rose, a white male 28 years younger than Buford who went to work for Ammar's just a few years back and does the same type of work as Buford (Ex. 17, at 1, 10, 13), quit and was *rehired* by Ammar's doing the exact same job — instead of moving a 24 year service, 69 year old African-American worker back to full time:

> Q    Ever quit?
> A    From here?
> Q    Yes, sir.
> A    Yes.  I quit here a couple of weeks ago.  But I came back a few days
> later.  I resigned.  I actually turned in the paper.
>
> …
>
> Q    And what happened?
> A    I was told by some of the bosses [at my new employer] that I might
> have to go to part-time or I might have to be let go because a driver who
> left the warehouse couldn't pass the DOT physical.
>       So I didn't want to take a chance.  So I called back. Because I
> couldn't go part-time.  I can't afford to go part-time.[7]
>
> …
>
> Q    So did you talk to Bill [Sankbeil in HR]?
> A    Yes.
> Q    Then what happened?
> A    He told me I could come back.  So I
> came back the next day.
>
> …
>
> Q    When you left Ammar's what was your job?

---

[7] Kevin Rose explained that he felt like his new job "tried to screw [him] over" by suggesting that it might move him to part time (Ex. 17, at 16) — which is of course precisely what Ammar's did to Buford.

> A    I was a invoicer.
>
>                   …
>
> Q    So you're doing the same thing you were doing.
> A    Yes.

(Id. at 6-7, 9-11).  Likewise, Ammar's moved James Gunnoe, a 34 year old white male in the same department as Buford — and who has only worked for the company for 3 years — to full-time, while leaving the 69 year old black male who has worked for the company for 24 years at 20 hours per week with no benefits (Ex. 4; Ex. 9).

And as Buford explained, the numbers in the PIP are not representative of his work anyways, and Ammar's knows this,

> I . . . received a performance improvement plan ("PIP") on August 18, 2014 concerning the number of orders I was able to process compared to other workers.[8]  Prior to the PIP, I received all of the time consuming jobs.

---

[8] Plaintiff requested, but never received, the records claimed to have been used to create the order counts in the PIP.  The documents that plaintiff was looking for were described by Buford during deposition,

> …where do you submit the invoices that you worked on?
> A  They go to the office.
> Q  Do you sign them, the invoices?
> A  Yes, we stamp them.  There is a company stamp that we stamp.
> Q  Does it say, does it have your employee number on it?  How do they know it is yours?
> A  It has my name on it.
> Q  It has your name on it?
> A  Yes.
> …
> A  Oh, yes, I have a little sticker I put at the top of the order when I finish it with my name on it.

(Ex. 5, at 101-02).  As a result of Ammar's refusal to produce the documents in question, Buford will request a spoliation inference at trial,

> First, there is the "court's inherent power to control the judicial process and litigation, a power that is necessary to redress conduct 'which abuses the judicial process.'" United Med. Supply Co. v. United States, 77 Fed. Cl. 257, 263-64 (2007) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)); accord Thompson, 219

> After the PIP, I was given the jobs that all of the younger, white workers had received previously that were not as time consuming due to the number of items that needed stickers.

(Ex. 6).  Tellingly, Kevin Doss and Kevin Rose "dropped" in performance at the exact same time Buford and Garnet Hurd miraculously "improved."[9]   In plain language, Ammar's sandbagged Buford.  In reality, as discussed *infra* at 28, Ammar's reliance on these numbers, which it knows full well it controls, is nothing more than a pretext for discrimination.

And as stated, as Sankbeil told the VEC, "Mr. Buford was at no fault in the reduction of hours" (Ex. 7; Exhibit 18).  Sankbeil corroborated this at deposition,

> Is that a true statement?
> A.   I would think it would be, for the unemployment people.
> Q.   I beg your pardon?
> A.   I believe it would be a true statement regarding his      unemployment.

---

F.R.D. at 100 (quoting Silvestri, 271 F.3d at 590); *see also* Adkins v. Wolever, 554 F.3d 650, 652 (6th Cir. 2009); Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006); Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005); In re NTL, Inc. Secs. Litig., 244 F.R.D. 179, 191 (S.D.N.Y. 2007). Second, if the spoliation violates a specific court order or disrupts the court's discovery plan, sanctions also may be imposed under Fed. R. Civ. P. 37. United Med. Supply Co., 77 Fed. Cl. at 264, *cited in* Sampson, 251 F.R.D. at 178.

Goodman v. Praxair Servs., LLC, 632 F. Supp. 2d 494, 505-06 (D. Md. 2009) ("A party may be held responsible for the spoliation of relevant evidence done by its agents; id. at 505-06 ("A party to a law suit, and its agents, have an affirmative responsibility to preserve relevant evidence. A [party] ... is not relieved of this responsibility merely because the [party] did not itself act in bad faith and a third party to whom [the party] entrusted the evidence was the one who discarded or lost it.") (citations omitted); *see also* N.J. Mfrs. Ins. Co. v. Hearth & Home Techs., Inc., No. 3:06-CV-2234, 2008 WL 2571227, at *7 (M.D. Pa. June 25, 2008);

[9] According to defendant's numbers (*see* Def. Facts 41 and 53), Ron Buford improved by doing 6% more of the packages while at the exact same time Kevin Rose started doing 8% less of the packages.  Similarly, at the same time Buford "improved" Garnet Hurd "improved" even more, doing 24% more of the packages, while Kevin Doss' performance "dropped" by 20% less of the packages.

Q.  Are you saying that that statement would be true to some people,   but false to others?
A.  I have no idea.
Q.  I was just asking whether the statement is true?
A.  I have answered, that I felt like it was true for unemployment.

…

Q.  Are you a truthful person?
A.  I am.
Q.  Do you always tell the truth?
A.  I do.
Q.  When you write things down, are they always true?
A.  They were.
Q.   Particularly when you're dealing with state or federal agencies, do you ever write something down that's not true?
A.  No.
Q.  Do you sometimes say things that are not true?
A.  No.
Q.  So if you write it down, it's true?
A.  It is.
Q.   Exhibit 2 is another letter from you, dated March 21, 2013.  You recognize this, don't you?
A.  Yes.
Q.  This is a letter from you to whom?
A.  To the VEC, the next week.
Q.  Why did you write this second letter?
A.  For him to get another week of additional unemployment compensation.
Q.   Again, if you look at the last sentence of the second paragraph, you write there, "Mr. Buford was at no fault in the reduction of hours."  Is that a true statement?
A.  I feel it's true.

(Ex. 2, at 20-23).   Ammar's is estopped therefore from suggesting that Buford's

performance had anything to do with the demotion.

The Fourth Circuit has clarified that the qualification/performance "prong

requires only that the plaintiff present evidence to create a question of fact that the

employer's 'proffered 'expectation' is not, in fact, legitimate at all.'"    Hill v.

Southeastern Freight Lines, Inc., 523 Fed. Appx. 213, 216 (4th Cir. 2013) (citing Warch

v. Ohio Cas. Ins. Co., 435 F.3d 510, 517 (4th Cir. 2006)).   At the time Buford's hours were reduced, Buford had only received two written warnings in his 23 year career, both of which concerned him delivering mail to the office — a function which is less than 10% of his job (Ex. 5, at 32).   Stated another way, at the time Ammar's cut Buford's hours in half and stripped him of his benefits, he had received *zero* complaints about the type of work he had predominantly performed for 24 years.   Ammar's is trying to rely on a write-up and PIP that it gave Buford long after it demoted him and *after* he filed suit against it to say that it had an issue with the speed of his work in the warehouse.   "Post-hoc justifications, [though,] even if legitimate, are more supportive of an inference of pretext than summary judgment."   Steele v. Kroenke Sports Enters., L.L.C., 2006 U.S. Dist. LEXIS 48576, at *13 (D. Colo. July 18, 2006) (citing Plotke v. White, 405 F.3d 1092, 1103-04 (10th Cir. 2005); Tyler v. RE/MAX Mountain States, Inc., 232 F.3d 808, 813 (10th Cir. 2000)); *see also* Chuang v. University of Cal. Davis, 225 F.3d 1115, 1129 (9th Cir. 2000) ("Given the obvious incentive in such circumstances for an employer to take corrective action in an attempt to shield itself from liability, it is clear that nondiscriminatory employer actions occurring subsequent to the filing of a discrimination complaint will rarely even be relevant as circumstantial evidence in favor of the employer" (quoting  Lam v. University of Hawaii, 40 F.3d 1551, 1561 n.17 (9th Cir. 1994) (citing Gonzales v. Police Dep't, City of San Jose, 901 F.2d 758, 761-62 (9th Cir.1990)))).   And, tellingly, the complaints that Ammar's claims it now has with respect to Buford's performance in the warehouse are not legitimate either.   Ammar's proffered expectation is that Buford should have the same production as other employees when it simply assigned to him tasks that take longer to complete.   Not surprisingly, when

Ammar's started to divvy up the time-consuming work, "miraculously" Buford's performance improved. Giving life and meaning to the adage "no good deed will go unpunished," Ammar's actually wrote Buford up when he volunteered to do an extremely time consuming job that no one else wanted to do — when he was the part-time employee and everyone else was full-time in his department.

As the United States Supreme Court has reiterated, "[t]he burden a plaintiff bears in meeting a prima facie case 'is not onerous.'" Murry v. Jacobs Tech., Inc., 2012 U.S. Dist. LEXIS 48169, at *33 (M.D.N.C. Apr. 5, 2012) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). "Accordingly, the Fourth Circuit has cautioned against the 'danger' that courts might apply the 'legitimate expectations' element of the prima facie case 'too strictly.'" Id. (citing Warch, 435 F.3d at 516-17); see also Inman v. Klockner Pentaplast of America, Inc., 347 F. App'x 955, 960 (4th Cir. 2009) (reversing grant of summary judgment because plaintiff presented sufficient evidence where jury could conclude that deficiencies claimed by defendant "were exaggerated to cover up the [improper] motivation . . . and that any such deficiencies were not sufficient to prevent his performance from being adequate"). Here, Ammar's employed Buford for 23 years, gave him raises throughout the years, and yet complains at age 64 he just stopped performing adequately — that dog just won't hunt. See, e.g., Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 673 (1st Cir. 1996) (finding that employee established a prima facie case and noting that many years of service and pay raises throughout the years "supports an inference that an employee's job performance was adequate to meet an employer's needs, even when the evidence did not extend all the way to the time of the discharge"

(citing Keisling v. SER-Jobs for Progress, Inc., 19 F.3d 755, 760 (1st Cir. 1994); Woodman v. Haemonetics Corp., 51 F.3d 1092 (1st Cir. 1995); Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 n.4 (1st Cir. 1994), cert. denied, __U.S.__, 115 S. Ct. 1958, 131 L. Ed. 2d 850 (1995); Woods v. Friction Materials, Inc., 30 F.3d 255, 261 (1st Cir. 1994)).

    **c.**   **Despite Buford's Qualifications His Hours Were Cut and He was Stripped of His Benefits.**

    Ammar's claims that it implemented an unwritten, undocumented company-wide cost savings plan in 2012 (Exhibit 19, at 10-11).[10]  According to Mr. Ammar, this was implemented by giving each store the number of hours it could use,

> Each store was the same way.  We said, "You've got to have a reduction in hours.  These are your hours."

---

[10] Mr. Ammar testified that this was at least partly due to Obama Care,

> Q.   Was the reduction in hours of the employees from full time to part time, in any way, a reaction to Obama Care?
> A.   It would be primarily economic, but Obama Care would be a factor.

(Ex. 1, at 67).  Which, Sankbeil corroborated,

> Q.   How do they Ammars feel about Obama Care?
>                . . .
> THE WITNESS:  As a business decision, they felt like it was a poorly conceived and poorly executed plan that put undue burden on each company.
> BY MR. GRIMES:
> Q.   You mean each company -- American business?
> A.   American business, yes.
> Q.   So has Ammar's reduced any employees from full time to part time, as a response or reaction to Obama Care?
> A.   In a round about way.
> Q.   What do you mean by that?
> A.   Reducing people to part time would be one of the ways of coping with the added expense of Obama Care.

(Ex. 2, at 47).

(Ex. 1, at 41).   But according to Sankbeil, they were given a specific number of

employees to reduce,

> A      Mr. K. A. Ammar Jr. during a meeting on a Monday morning said
> that we needed to reduce our hourly staff by one and reduce two people to
> part-time immediately that day -- or that week.  I'm sorry.
> Q      And this was said in a staff meeting on a Monday?
> A      On a Monday morning management meeting.
> Q      Who was charged with implementing that plan?
> A      Jerry Carter, Jimmy Belcher and myself.
> Q      Tell us who those people are with respect to the company.
> A      Jimmy Belcher is the warehouse manager, Jerry Carter is the
> administrative vice president of the company, and myself, I'm the HR
> safety director for the company.

(Ex. 19, at 10-11).

> Q      And who were the affected employees?
> A      Ron Buford was reduced to part-time, Aaron Lowe[11] was reduced to
> part-time and an Aaron -- Matthew Aaron Webster was laid completely
> off.

(Ex. 19, at 12).

> Q      Who made the decision concerning the magnitude of the reduction?
> That is, who made the decision to reduce Mr. Buford's hours from 40 to
> 20 hours per week?
> A      That would be more in the lines of Jimmy Belcher because he knew
> the workload or what he needed Mr. Buford to work and the others.

(Id. at 15).  Yet Jimmy Belcher clearly refuted this,

> Q.  Someone suggested reducing Mr. Buford's hours?
> A.  Yes.
> Q.  Was that you, or do you know?
> A.  No.  It wasn't me.  I don't know.

(Ex. 16, at 21).   And according to Buford, Sankbeil told him plainly that he asked

Mr. Ammar not to cut Buford's hours, but Mr. Ammar would not relent (Ex. 6).

---

[11] Lowe was later terminated for his attendance (Ex. 5, at 58).

Significantly, *no one* at Ammar's will take responsibility for suggesting that Buford be the one to have his hours cut in half and his benefits stripped. Although plaintiff disputes that Ammar's had a legitimate reason to lay off employees, it does not matter whether Ammar's had a legitimate reason to lay off employees. What matters is why Buford was chosen. Ammar's claims that it used performance to choose Buford. Yet, the record tells a different story. And, even having a "performance" based lay off can be laden with discrimination, "[f]ollowing facially neutral RIF procedures, [based on performance,] however, does not necessarily insulate an employer from ADEA [or Title VII] liability or from a sustainable finding of a willful violation." Miller v. Raytheon Co., 716 F.3d 138, 144 (5th Cir. 2013). For instance, here, Kevin Rose, a white receiving department employee who is 28 years younger than Buford and has only worked for the company since late 2009, has missed many days of work (Ex. 4; Ex. 6). Yet, his hours were not reduced in the RIF. Moreover, he recently quit Ammar's to go to another job, but then was hired back approximately a week later to a full-time position when his new job did not work out (Ex. 6). Buford on the other hand, still has no benefits and has been moved back to working part time again (Id.). And as will be shown, the subjective nature of Ammar's criteria gives rise to an inference of discriminatory animus.

### d. **Buford was Replaced by A Young, White Male.**

After Buford's hours were cut in half and he was stripped of his benefits, Ammar's gave his work to a young, white male employee.

> Q     Okay.   So right now are you aware of anyone employee that exclusively works on UPS/Fed-X work or is it spread around amongst the receiving department employees?
> A   I know of one employee who gets orders for UPS, and he basically does most of the UPS.

(Ex. 5, at 41-42).

> Q   What was Wayne Redman, R-E-D-M-A-N, what was his job?
> A   Well, he took over UPS when I was demoted to part time.
> Q   Okay.  Do you know if he was the only one that did UPS or were there other people doing UPS?
> A   He was for a period, yes.

(Id. at 133).  As Buford testified, Redman is both younger and white,

> Q   Let's just look at the race side of it first.  What facts do you have to support your claim that race was a factor in the company's decision to make you part time in February of 2013?
> … 
> A   Other than working here for almost 24 years and being, my job being given to a younger white man, I don't see what other facts there should be.  I mean, that's --

(Id. at 29-30).

### e.   **The Record Supports a Finding That Ammar's Stated Reason for Buford's Demotion is Pretext.**

As Buford has established a prima facie case, Ammar's must respond with evidence that it acted with a legitimate, nondiscriminatory reason.  Love-Lane, 355 F.3d at 786 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)).  As an initial matter, it is suspect whether Ammar's cut Buford's hours as part of a reduction in force ("RIF") to begin with.  Ammar's claims that it implemented an unwritten, undocumented company-wide cost savings plan in 2012 (Ex. 19, at 10-11).  "[F]ailure to keep records of the reduction in force that resulted in [plaintiff's] termination may itself constitute evidence that the reduction in force was pretextual."  Moll v. Telesector Resources Group, Inc., 760 F.3d 198, 204 (2014).  And, it is hard to believe anything that the company says as its CEO — who everyone concedes

controls all of the decisions in the company[12] — has proved himself to be incredible.  At

deposition, K.A. Ammar, Jr. clearly testified that he made $30,000 a year plus dividends

— and that Ammar's stopped paying dividends two years ago,

> Q.  Do you still draw a salary?
> A.  I guess you would say I would.  It's a big number, $2,500 a month, which is, what, $30,000 a year?
> Q.  Yes, sir.
> A.  That's paid for my time spent with the board of directors, at that level.
> Q.  So do the directors draw a salary?
> A.  Yes.
> Q.  Is it $2,500 a month?
> A.   Trey doesn't draw one because he's a full-time employee.  Sarah doesn't draw one because she's full time.
>     Nick Ammar draws one because he's on the board.  Richard draws one because he's on the board.  And I draw one because I'm on the board.

(Ex.1, at 26).

> Q.  In addition to the salary you draw, as a member of board of directors, does the stock pay dividends?
> A.  We did until the last two years.  We have not paid one.
> Q.  How is that determined?  Do you know?
> A.  If you make a profit, you pay a dividend.  If you don't make a profit, you don't pay a dividend.
> Q.  Who determines that?  The comptroller or somebody else?
> A.  If the P&L comes out and it loses money, you read it.
> Q.  But who makes the call then?  Does the board of directors --
> A.  That's right.
> Q.  -- vote on that?
> A.  That's right.
> Q.  Now I understand.  The board of directors --
> A.   My understanding is that the board of directors would not pay a dividend if we did not make a profit.

(Id. at 31-32).

> ...I have no company car.  I don't get any other source of anything.

(Id. at 35).  But, Ammar's deposition testimony is flatly refuted by the documentary

---

[12] As Bill Sankbeil testified, the buck stops with individuals with the last name Ammar (Ex. 2, at 44; *see also* Ex. 11, at 5 ("Well, I report to anybody named Ammar")).

evidence recently and reluctantly produced by Ammar's — and even then only *after* this Court entered an order compelling Ammar's to produce discovery that should have been produced months ago.   That evidence shows plainly that K.A. Ammar, Jr.'s ordinary income in 2013 was $79,132.90, and he received $1,254.05 in nonemployee compensation and $6,657.92 in dividends (Exhibit 20; Exhibit 21).

The company's documentary evidence therefore contravenes Ammar's deposition testimony and supports a finding that his deposition testimony was perjurious.   The inescapable conclusion is that absolutely nothing that Ammar's says can be taken at face value, and without the intervention of this Court, plaintiff would never been able to obtain any meaningful discovery in this case.

Next, Mr. Ammar made clear at deposition that he owns very little stock,

Q.   Do you know how much stock you own, what percentage?
A.    No.  I would guess 10 or 12.  I've given most of my stock to my children.  I don't have that much. I want to get rid of it.  I don't -- not that there's anything wrong with it, but for estate planning purposes, the more I can give away.  I give the maximum gift.
Q.   I understand.  You do that for estate planning purposes?
A.   Exactly, that's why.

(Ex. 1, at 35).  Thus, it is hard to understand how a company that claims it lost over $200,000 dollars in 2013 simultaneously paid K.A. Ammar, who owns approximately only 10% of the shares, almost $7,000 in dividends — not to mention paid its four officers a combined compensation of $356,101.53, plus $2,007.57 in nonemployee compensation, plus $31,405.44 in dividends; and likewise, paid its vice president of administration, Jerry Carter, approximately $96,000 (Ex. 11, at 5-6).  For a ship that is sinking, Ammar's certainly treats its captain and officers extraordinarily well.

Moreover, Ammar's claim that it chose Buford as one of three individuals to be

affected by the RIF at its warehouse because after 24 years of service, he was slow at his job, is likewise incredible.[13]   First, no one will take responsibility for suggesting that Buford should have been demoted.   And, as explained *supra* at 20, at the time Ammar's decided to cut a 23 year service, African-American, 69 year old employee's hours in half and strip him of his benefits, Buford had received no write ups for the job he performed over 90% of the time he was at Ammar's.[14]   And the evidence that Ammar's manufactured written disciplinary warnings *after* it made this decision is actually further evidence of pretext.   Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (noting that pretext may be established with evidence that "nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action").   In truth, Ammar's has been sandbagging Buford at times by assigning more time-consuming work, then later complaining that he worked too slow. Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1293 (D.C. Cir. 1998) ("If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination. . . . [A]ccording to ordinary evidentiary principles . . . a lie is evidence of consciousness of guilt.").   And, Buford is still making less than his white, younger counterparts who have worked for Ammar's for much less time than Buford.   For instance, David Blankenship, a 39 year old white

---

[13]   Assuming *arguendo* that Ammar's has advanced a legitimate, nondiscriminatory reason to demote Buford, as demonstrated *infra* and *supra* at 25-31, Buford has presented evidence that demonstrates a question of fact as to whether defendant's articulated reason is pretext for unlawful discrimination.   Love-Lane, 355 F.3d at 786 (citing St. Mary's Honor Ctr., 509 U.S. at 507-08).

[14]   Additionally, Ammar's now claims that Buford's wages were "frozen" at the time he was demoted — yet this word was never even uttered to Buford until after he filed suit (Ex. 5, at 68).   "Post-hoc justifications, even if legitimate, are more supportive of an inference of pretext than summary judgment." *See, e.g.*, Steele, 2006 U.S. Dist. LEXIS 48576, at *13 (citing Plotke, 405 F.3d at 1103-04; Tyler, 232 F.3d at 813).

receiving department employee, has worked for the company since March 2010 — 20 years less than Buford — yet he makes more money per hour than Buford (Ex. 4). Likewise, Robert Williams, a 58 year old white receiving department employee, has worked for the company since September 1991 — approximately a year after Buford went to work for Ammar's — yet he makes approximately $3.00 more per hour (Id.). Tellingly, Buford brings home the least amount of money in his department despite his seniority:

| | |
|---|---|
| Ronald Buford | $11,351.57 |
| James Gunnoe Jr. | $14,639.22 |
| Kevin Rose | $18,408.72 |
| Aaron Ayoub | $18,547.35 |
| Shawn Graham | $18,951.35 |
| Jeffery Ellison | $18,965.40 |
| Ronald Joplin | $18,993.70 |
| Jackson Martin | $19,099.06 |
| Garnett Hurd | $19,216.44 |
| Albert Gibson | $19,295.63 |
| Robert Lee Perdue | $19,840.03 |
| Dwayne Bailey | $21,031.14 |
| John Allen Kelly* | $21,059.94 |
| Jeffrey Riggs | $21,096.70 |
| David Blankenship | $22,380.57 |
| Gary Nichols | $24,949.93 |
| Robert Williams | $25,450.43 |
| George Ray | $32,383.25 |
| Fernando Roland | No W-2 provided |

*John Kelly had two W-2s for different amounts.  This represents both combined (Exhibit 22).

As is well established, while summary judgment is available in cases alleging employment discrimination, it should be applied with caution "because the crux of a Title VII dispute is the 'elusive factual question of intentional discrimination.'"  Lowe v. City of

Monrovia, 775 F.2d 998, 1009 (9th Cir. 1986) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 n.8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).  Thus, special caution must be exercised when the disposition of an issue turns on a determination of intent.  Morrison v. Nissan Co. Ltd., 601 F.2d 139, 141 (4th Cir. 1979).  As one district court has explained,

> Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g.*, Riordan v. Kempiners, 831 F.2d 690, 697-98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." Rogers v. EEOC, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

Myers v. Hog Slat, Inc., 2014 U.S. Dist. LEXIS 152649, at *27-28 (N.D. Iowa Oct. 24, 2014) (quoting Pick v. City of Remsen, 2014 U.S. Dist. LEXIS 119434, 2014 WL 4258738, at *12 (N.D. Iowa Aug. 27, 2014)).  Here, Mr. Ammar allegedly told three warehouse employees to choose one employee to layoff and two to reduce to part-time effective immediately that day (Ex. 19, at 10-11).  This process (or lack thereof) is entirely subjective.  As the Sixth Circuit has explained, a decision made in this manner is "a ready mechanism for discrimination,"

> The procedure used by the employer in the present case permitted the plant foremen to select, among former employees, those persons they desired to have rehired. The employer thereby delegated the employment decision, as to this group of applicants, to the foremen for their subjective evaluations. This Court has previously noted the problems inherent in selection procedures which rely solely upon the subjective evaluations of

> all white supervisory personnel. *See, e.g.*, <u>Senter v. General Motors Corp.</u>, 532 F.2d 511, 528-29 (6th Cir.), <u>cert. denied</u>, 429 U.S. 870, 50 L. Ed. 2d 150, 97 S. Ct. 182 (1976); <u>Shack v. Southworth</u>, 521 F.2d 51, 55-56 (6th Cir. 1975). While such procedures are not *per se* violative of Title VII, <u>Hester v. Southern Railway Co.</u>, 497 F.2d 1374, 1381 (5th Cir. 1974), they do provide a ready mechanism for discrimination, permitting racial prejudice to affect and often control promotion and hiring decisions. <u>Harris v. Group Health Assn.</u>, 213 U.S. App. D.C. 313, 662 F.2d 869, 873 (D.C. Cir. 1981); <u>Parson v. Kaiser Aluminum & Chemical Corp.</u>, 575 F.2d 1374, 1385 (5th Cir. 1978), <u>cert. denied sub nom.</u>, <u>Local 13000, United Steelworkers of America v. Parson</u>, 411 U.S. 968, 99 S. Ct. 2417, 60 L. Ed. 2d 1073 (1979); <u>Rowe v. General Motors Corp.</u>, 457 F.2d 348, 359 (5th Cir. 1972). While we recognize that, in some circumstances, employment decisions may be made on the basis of such subjective criteria, any procedure employing such subjective evaluations will be carefully scrutinized in order to prevent abuse. <u>Jenkins v. Caddo-Bossier Association for Retarded Children</u>, 570 F.2d 1227, 1229 (5th Cir. 1978).

<u>Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.</u>, 690 F.2d 88, 92-93 (6th Cir. 1982).  Careful scrutinization here reveals that there is a question of fact as to whether race was a factor in the subjective evaluations, and therefore there is at the very least a question of fact as to whether Buford's hours were cut in half and he lost his benefits because of his race.

### 2. Circumstantial Evidence Supports a Finding that Age Discrimination Motivated Ammar's Decision to Cut Plaintiff's Hours in Half and Strip Him of His Benefits.

The Age Discrimination in Employment Act (ADEA) prohibits an employer, as defined in the ADEA, from terminating anyone because of age. 29 U.S.C. § 623(a)(1).  To establish a claim for age discrimination under the ADEA, a plaintiff must prove by a preponderance of the evidence that age was a but-for cause of the challenged adverse employment action.  <u>Burrage v. United States</u>, 2014 U.S. LEXIS 797, at *16 (alteration in original) (citing <u>Gross</u>, 557 U. S. at 176).  As is clear, <u>Gross v. FBL Financial Servs.</u>'s requirement that ADEA plaintiff prove age was a but-for cause of adverse employment

action does not preclude plaintiff from establishing a discrimination claim based on age, plus some other trait — here, race.  Leal v. McHugh, 731 F.3d 405, 414-15 (5th Cir. 2013) (citing Gross v. FBL Financial Services, Inc., 557 U.S. 167, 180 (2009)).  Under McDonnell Douglas, Buford can demonstrate a prima facie case of age discrimination by demonstrating a question of fact with respect to whether "(1) he is a member of the protected class; (2) he was qualified for the job and met [the employer's][] legitimate expectations; (3) he was discharged despite his qualifications and performance; and (4) following his discharge, he was replaced by a substantially younger individual with comparable qualifications."  Warch, 435 F.3d at 513 (citing O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312-13, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996); Causey v. Balog, 162 F.3d 795, 802 & n.3 (4th Cir. 1998)).  But, when "the evidence creates a close call …, we must remember that 'the burden of establishing a disparate treatment is not onerous.'"  Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  In fact, it is a "relatively modest" burden.  Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 545 (4th Cir. 2003) (citations omitted).  The ADEA is in fact violated if an employer considers age in deciding which workers to lay-off in a reduction in force. See 29 U.S.C. Sections 621-634 (1994).

### a.  Buford Is A Member of the Protected Class.

Buford was 68 years old at the time of the demotion and is therefore a member of the protected class (Ex. 6). See 29 U.S.C. § 631(a).

### b.  Buford was Qualified for the Job and Met His Employer's Legitimate Expectations.

For the same reasons as stated *supra* at 11-22, Buford was qualified and adequately performing his job at the time of the demotion.

### c.  Buford was Demoted Despite His Qualifications and Performance.

For the same reasons as stated *supra* at 22-24, Buford was qualified for his position and was performing adequately at the time of the demotion.

### d.  Buford was Subsequently Replaced By A Significantly Younger Individual.

Although there is not a set age difference that constitutes "significantly younger," the Supreme Court has stated: "[T]here can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old." O'Connor, 517 U.S. at 313. As is evident from the Supreme Court's language, the Court, and subsequently the Fourth Circuit, has focused on the age of the replacement employee as a determining factor. Id.; *see also, e.g.*, Reed v. Buckeye Fire Equip., 241 Fed. Appx. 917, 927 (4th Cir. 2007) (concluding that transferring job duties to workers who were ten and fifteen years younger than the appellant was sufficient to establish that his job duties were given to younger workers because "[t]he fact that [the replacements were][] also in the class protected by the ADEA is not material" (citing O'Connor, 517 U.S. at 312)).  In doing so, the Court has stated that "[b]ecause the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." O'Connor, 517 U.S. at

313.   Here, after Buford's hours were cut in half and he was stripped of his benefits, Ammar's gave his work to a white male employee who was 25 years younger than Buford (Ex. 4, at Ammars003050; Ex. 5, at 29-30).   The Fourth Circuit has found age gaps much smaller than 25 years to be significantly younger.   *See* Reed, 241 Fed. Appx. at 927.

Ammar's cannot save itself by claiming that it laid off a white male under the age of 40 (*contra* Def. Br. at 3). *See* Strickland v. United Parcel Service, 555 F.3d 1224, 1230 (10th Cir. 2009).   Christmas v. Arc of the Piedmont, 2013 U.S. Dist. LEXIS 26676 (W.D. Va. Feb. 27, 2013) in not instructive here (*contra* Def. Br. at 13-14).   In Christmas, the plaintiff's "sleep position," and the work that went along with the position, was eliminated because the defendant group home decreased its number of residents.   Here, Ammar's continues to receive UPS and FedEx packages and Buford's work was redistributed to a younger, white employee.   Moreover, in Christmas, the group home eliminated both of the sleep positions it previously had.   Therefore, there was no similarly situated employee for Christmas to compare her situation to.   Here, Buford has the entire warehouse — and certainly the entire receiving department — of employees to compare to, and as stated *supra* at 16-17, 24, similarly situated employees were treated differently here.   Moreover, as is evident, nondiscrimination of one employee will not save discrimination against another.   *See, e.g.*, Brown v. Henderson, 257 F.3d 246, 252 (2nd Cir. 2001).   Likewise, the age of the individuals who claim to have made the decision to demote Buford — although none of them claim they were the one who suggested Buford should be the one to have his hours cut — is hardly dispositive.   For instance, the Seventh Circuit noted in Kadas v. MCI Systemhouse Corp.,

The supervisor who riffed the plaintiff was even older than the plaintiff -- 56 -- and dicta in a number of cases suggest that this is a factor that should weigh heavily against a finding of age discrimination. *See, e.g.*, Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 572 (7th Cir. 1998); Mills v. First Federal Savings & Loan Ass'n, 83 F.3d 833, 842 (7th Cir. 1996); Wexler v. White's Fine Furniture, Inc., *supra*, 246 F.3d at 866-67; Brown v. CSC Logic, Inc., 82 F.3d 651, 658 (5th Cir. 1996); Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1337 (8th Cir. 1996); *see also* Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1471 (11th Cir. 1991); *but cf.* Rea v. Martin Marietta Corp., 29 F.3d 1450, 1456 (10th Cir. 1994). On reflection, we offer the counterdictum that the relative ages of the terminating and terminated employee are relatively unimportant. For it is altogether common and natural for older people, first, to exempt themselves from what they believe to be the characteristic decline of energy and ability with age; second, to want to surround themselves with younger people; third to want to protect their own jobs by making sure the workforce is not too old, which might, if "ageist" prejudice is rampant, lead to RIFs of which they themselves might be the victims; and fourth, to be oblivious to the prejudices they hold, especially perhaps prejudices against the group to which they belong. We emphatically rejected the "same-actor inference" in the race-discrimination setting in Johnson v. Zema Systems Corp., 170 F.3d 734, 745 (7th Cir. 1999), and our conclusion there applies with equal force to proof of age discrimination.

Kadas v. MCI Systemhouse Corp., 255 F.3d 359, 361 (7th Cir. 2001).  Tellingly, Bill Sankbeil testified that he felt that he has not slowed at all with age,

    Q.  Do you've noticed you've slowed down with age at all?
    A.  No.
    Q.  Not at all?
    A.  Not at all.

(Ex. 19, at 15-16).  It is absolutely "plausible" as a matter of law that the decision makers here could have selected Buford because of his age — regardless of their age — especially given that they were not themselves required to do the manual labor in the warehouse like Buford (*contra* Def. Br. at 4).

### e.   The Record Supports a Finding That Ammar's Stated Reason for Buford's Demotion is Pretext.

As with the race discrimination claim, Buford has established a prima facie case of age discrimination, and thus the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the termination.  Hill, 354 F.3d at 285.  Furthermore, where a plaintiff has succeeded in establishing her prima facie case, "the fact-finder's rejection of the legitimate, nondiscriminatory reason proffered by the defendant, coupled with the elements of the prima facie case, may permit the fact-finder to infer the ultimate fact of invidious discrimination with no additional proof of discrimination."  Jiminez v. Mary Wash. Coll., 57 F.3d 369, 378 (4th Cir. 1995).[15]  Again, for the reasons stated *supra* at 25-31, the proffered reason by Ammar's is pretext for discrimination.

---

[15] None of the cases cited by defendant change this result.  Buford has used the McDonnell Douglas framework to offer substantial circumstantial evidence — not direct evidence — to prove that there is a question of fact with respect to whether he was discriminated against due to race and age.  Buford is absolutely able to prove his case with circumstantial evidence produced during discovery.

First, in Pharr v. DesignLine USA, LLC, 2012 U.S. Dist. LEXIS 38828, at *16-19 (W.D.N.C. Mar. 22, 2012), the plaintiff admitted that she did not believe that the decision-maker discriminated against her, and offered no evidence of differential treatment — instead she only offered her "gut" feeling.  Here, Buford has offered ample evidence as to how he has been treated differently, and as to how Ammar's newly created complaints about the speed of his work in the warehouse are not legitimate.

Next, in Wilson v. S.C. DOL, Licensing & Regulation, 2014 U.S. Dist. LEXIS 138841, at *26 (D.S.C. Aug. 11, 2014), the employer eliminated an entire department — that had African Americans and Caucasians in it.  That is entirely different than what happened here, where Buford was handpicked to have his hours cut in half and lose all his benefits.  Here, there was ample room for discriminatory animus to play a part in who was chosen.  Whereas, when an entire department is eliminated, it is much more difficult to understand how the employer discriminated against just the African-Americans in the department.

Finally, in Ferris v. AAF-McQuay, Inc., 2007 U.S. Dist. LEXIS 61717, at *11-15 (W.D. Va. Aug. 22, 2007), the plaintiff admitted that she poorly performed and said "that she would have improved her performance had she received a formal written notification that her job was in jeopardy."  And, there was nothing in the record to suggest that her performance was not actually below her co-workers.  Here, Buford has refuted Ammar's

**f.   The Record Supports a Finding that Age was a But-For Cause for Buford's Demotion.**

As the Supreme Court recently clarified in <u>Burrage</u>, "a plaintiff must prove that age was [a] 'but for' cause of the employer's adverse decision."   <u>Burrage v. United States</u>, 2014 U.S. LEXIS 797, at *16 (alteration in original) (citing <u>Gross</u>, 557 U. S. at 176).  In discussing its prior opinions in <u>University of Tex. Southwestern Medical Center v. Nassar</u>, 570 U.S. __ 133 S.Ct. 2517, 2528 (2013), slip opinion at *11-12, and <u>Gross v. Financial Services, Inc.</u>, 557 U.S. 167, 176 (2009), the Court substituted a bracketed "[a]" for the word "the" preceding the expression "'but for' cause." <u>Id.</u> at *15-16.  Thus, "but for" causation does not require a showing that an impermissible motive was the sole cause of the challenged action.  Further, "very little evidence [is required in cases such as this] to survive summary judgment precisely because the ultimate question is one that can only be resolved through a 'searching inquiry' -- one that is most appropriately conducted by a factfinder, upon a full record."   <u>Stegall v. Citadel Broad. Co.</u>, 350 F.3d 1061, 1072 (9th Cir. 2003) ("[B]ecause motivations are difficult to ascertain, such an inquiry should be left to the trier of fact: 'An employer's true motive in an employment decision is rarely easy to discern. . . . '[W]ithout a searching inquiry into these motives, those [acting for impermissible motives] could easily mask their behavior behind a complex web of post hoc rationalizations . . . '" (citing <u>Sischo-Nownejad v. Merced Community College District</u>, 934 F.2d 1104, 1111 (9th Cir. 1991))).  As the Fourth Circuit has noted, special caution must be exercised when the disposition of an issue turns on a determination of intent.  <u>Morrison</u>, 601 F.2d at 141.

---

claim that he was working slower than his co-workers in the warehouse as the numbers relied upon by Ammar's are not actually representative of his work.

The record here supports a finding that there is at the very least a question of fact as to whether age was a but-for cause for Buford's demotion as a jury could certainly find so.  Miller v. Raytheon Co., 716 F.3d 138 (5th Cir. 2013) is instructive.  In Miller, the plaintiff was a long-time employee like Buford.  Miller, 716 F.3d at 142.  The employee performed well in his position for some time, and then in 2007 received a "Needs Improvement" rating on his mid-year review for missing deadlines. Id. The employer initiated a RIF in early 2008. Id.  The RIF plan required the managers to evaluate their employees, rank them, and recommend a list of employees for reduction. Id.  Miller was recommended for reduction and was terminated. Id. at 143.  According to company policy, due to Miller's seniority, usually he would have received another job within the company, but he was unable to do so because of his "Needs Improvement" rating. Id. Miller was never rehired.  Id.  A jury found that the employer had terminated Miller in willful violation of the ADEA.  Id.  The court did not disturb the jury's verdict, noting that even though the company had instituted facially age-neutral policies, "[f]ollowing facially neutral RIF procedures, however, does not necessarily insulate an employer from ADEA liability or from a sustainable finding of a willful violation." Id.  at 146.

Here, Ronald Buford is a 69 year old, African American, 24 year employee of Ammar's.  He is the oldest person working in Ammar's warehouse and is one of only three African-American warehouse employees.  After 24 years of service, Buford makes approximately $10.70 an hour — about $3.00 less than a white employee doing the same job as Buford who was hired a year later than him.  On February 13, 2013, Ammar's took away Buford's full-time job, cut his hours to 20 hours per week, and stripped him of his benefits.  Ammar's claims it did this because after 24 years of service he was chosen as

one of 3 employees to be affected by an unwritten, undocumented reduction in force plan. And, while his hours were reduced, and his benefits were cut, a younger, white employee in his department who has attendance issues and who has only worked for the company for a couple of years was able to leave the company and come back to his full-time job when it did not work out — while Buford is still part-time with no benefits. Buford is the oldest employee in his department and has seniority, yet he brings home the least amount of money. Clearly, Buford has created a question of fact as to whether age was really a but-for cause of his demotion. Therefore, summary judgment must be denied.

CONCLUSION

After stating plainly in writing in March 2013 that "Mr. Buford was at no fault in the reduction of hours" (Ex. 7), Ammar's now claims that Buford was demoted for poor performance. And after telling Buford and other warehouse workers that there would be no need to reduce the number of warehouse workers or their hours, and that Ammar's had more than sufficient funds to take care of business, and after paying its executives significant salaries *and* dividends, Ammar's now claims that Buford's demotion had something to do with the economy. And after testifying under oath that he made only $30,000 per year and received no dividends, the company's own documents show that Mr. Ammar's income in 2013 was $79,132.90 and that he received $1,254.05 in nonemployee compensation and $6,657.92 in dividends (Ex. 20; Ex. 21). Simply put, nothing Ammar's says can be believed, and here, the evidence supports a finding that in February 2013, Ammar's tried to force an old, black worker out of the company by cutting his hours in half and stripping his benefits.

In summary, material questions of fact preclude summary judgment. Plaintiff

39

Ronald G. Buford therefore requests entry of an order denying Ammar's Inc.'s motion for summary judgment.

Respectfully Submitted,

RONALD G. BUFORD

By ____/s/ Terry N. Grimes____
                    Of Counsel

Terry N. Grimes, Esq., (VSB No. 24127)
Brittany M. Haddox, Esq. (VSB No. 86416)
TERRY N. GRIMES, ESQ., P.C.
320 Elm Avenue, SW
Roanoke, Virginia 24016
TELEPHONE:  (540) 982-3711
FACSIMILE:  (540) 345-6572
tgrimes@terryngrimes.com
bhaddox@terryngrimes.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of January, 2014, a true and accurate copy of the foregoing was electronically filed with the Clerk of Court through the CM/ECF system, which will send notification to all counsel of record.

_____/s/ Terry N. Grimes_____
                    Terry N. Grimes